# EXHIBIT A

M453ROWC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                              22 MJ 2664

ISZAYAH ROWSON,

             Defendant.

------------------------------x    Bail

                                New York, N.Y.
                                April 6, 2022
                                11:15 a.m.

Before:

                HON. KATHERINE POLK FAILLA,

                              District Judge

                        APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
JAMES LIGTENBERG
ELIZABETH ESPINOSA
    Assistant United States Attorneys

JOHN SIGNARELLO
    Attorney for Defendant

ALSO PRESENT: Laura Gialanella, Pretrial Services

(Case called)

MR. LIGTENBERG:  Good morning, your Honor.  Jim Ligtenberg for the government joined by Elizabeth Espinosa.

THE COURT:  Good morning and to whom -- hi.

MS. GIALANELLA:  Laura Gialanella on behalf of pretrial services.

THE COURT:  Yes.  Long time no see.  Thank you.

Let me know, please, to whom I should be directing my questions this morning.

MR. LIGTENBERG:  To me, your Honor.

THE COURT:  It's pronounced Ligtenberg, sir?

MR. LIGTENBERG:  Yes.

THE COURT:  Thank you so much.

MS. ESPINOSA:  I may need to leave a few minutes early as I have a plea in front of Judge McMahon at noon.  So I'll be here.  I apologize if I do have to step out.

THE COURT:  I'm sure she'll understand.  All right. Thank you very much.

Mr. Signarello.

MR. SIGNARELLO:  Lebedin Koffman by John Signarello. Good morning.

THE COURT:  Good morning, sir.  Thank you.  And Mr. Rowson, good morning to you as well.

THE DEFENDANT:  Good morning, Judge.

THE COURT:  Mr. Ligtenberg, let me begin with you,

M453ROWC

please.  I understand this is an appeal from a bail decision that was issued yesterday by Magistrate Judge Willis. Beginning with the easy stuff, tell me please what do you believe the standard of review is, sir.  Or is this a de novo review?

MR. LIGTENBERG:  De novo review, your Honor.

THE COURT:  Let me tell both sides that one of the reasons it took me a few moments to come down here this morning, I received a little bit late the audio file of yesterday's proceeding and I did listen to it and take notes. But, there were some passages that were harder to hear than others.  If you wish to restate in their entirety everything you said yesterday to Judge Willis, that's fine.

But I think what I'm understanding to be some of the issues were the nature of the state and federal charges, and then separately, whether there was a failure to appear and whether that failure to appear was excused by directives or advice that Mr. Rowson received from his then attorney, the attorney who preceded Mr. Signarello.  So, that's some of the things I understood.

But, I will say that the recording that I received sort of started at the point of the bail hearing.  So, if there were important facts that were discussed a little bit earlier in the presentment, I might not have heard those.

Mr. Ligtenberg, go ahead.

MR. LIGTENBERG:  I'll try to touch on all of those issues, but if you have any questions, happy to answer them.

So, as your Honor knows, the government's seeking detention based on both danger and flight risk, and believes that no combination of conditions short of detention would reasonably assure community safety and the appearance of the defendant as required.

So I'll start with danger.  Here I'm also going to refer to some information that we are going to put before the Court that was not before Judge Willis, so you would not have heard on the recording.

The defendant is a gang member who has repeatedly possessed firearms, including a stolen firearm, and including while on pretrial release.

So let's start with about one year ago.  On April 8, 2021, law enforcement officers saw a man on a social media live stream waving a gun around.  They recognized the area where this was occurring, and so law enforcement responded to that area.

THE COURT:  This is April of 2021?

MR. LIGTENBERG:  Correct, your Honor.

And they saw the defendant running away, fleeing the police.  They recognized him because they knew him from the neighborhood.  They've conducted car stops of him before, so they knew who he was.  And while he fled, the officers saw him

drop a gun on the ground which they picked up.  The gun was loaded.  Unfortunately, the officers were not able to apprehend him at this time.  He got away.  A warrant was issued for his arrest, and he was not found for almost two months.  He was finally arrested on June 1st, 2021, and then he was later indicted by a grand jury in the Bronx for criminal possession of a weapon in the second degree and criminal possession of a firearm.  Those charges are still pending against the defendant.  So since June of 2021, the defendant has been on pretrial release for that first gun case.

But having this pending gun charge did not deter the defendant from possessing a loaded firearm again.  One month ago, on March 5, 2022, police officers conducted a car stop when they noticed the defendant was not wearing a seat belt in the back of an Uber.

THE COURT:  Just pause for a second there, sir.  Based on what I was hearing from yesterday's discussion, there is some question about the tinting or not of the windows, and so I'm sensing there is a suppression hearing in the offing.  The representation from the defense was that the windows were tinted such that one could not see inside.

Have you looked at the materials in this case and can you provide information on that issue or perhaps contradicting that representation?

MR. LIGTENBERG:  Your Honor, I haven't had a chance to

M453ROWC

talk to the officer again.  Last night after that representation was made, I rewatched the body camera footage. The windows to me do not appear to be remotely tinted.

THE COURT:  You were able to see in?

MR. LIGTENBERG:  Absolutely.  And I would note that the defendant is wearing a white shirt, he is wearing a denim jacket, a very light denim jacket, such that if there were a seat belt over the top of it, you would be able to see the seat belt.  It would contrast with the colors.

I also note when you watch the videos, one of the first things out of officer's mouth is "You weren't wearing a seat belt," and he in fact was not wearing a seat belt.  So the video itself corroborates what the officer has also told me, which is that's why they conducted the stop, because they saw inside the car, and they could see that he was not wearing a seat belt.

THE COURT:  Okay.  Please continue, sir.

MR. LIGTENBERG:  When they talked to the defendant, he was nervous, the officer noted a bulge in the defendant's pants consistent with a gun.  The officer asked the defendant to step out of the car, patted him down, and found a gun in his pants. That gun was loaded with 13 rounds of ammunition.  The officers then ran the gun through their system and learned this was a stolen gun.  The gun had been reported stolen from Virginia about a month earlier, on February 8, 2022.

So, even though defendant was on pretrial release for a gun possession charge, he nevertheless chose to possess another gun, the gun was loaded, the gun was stolen.  And as your Honor knows, that means the defendant likely either acquired it on the black market or, potentially I guess, stole it himself.  But ultimately it means that if he had committed an act of violence with that gun, it would be very difficult to trace that gun back to him.

THE COURT:  Did I understand from defense counsel yesterday that with respect to what I will call the state charge, the individual that was seen in the social media live stream was masked?

MR. LIGTENBERG:  That is my understanding.  But regardless of who was in the social media live stream, the point is that the officers saw the defendant himself running away and the defendant dropping the gun.  That is the basis for the illegal gun charge.  So, regardless of -- my understanding is they also recognized him masked because they know who he is.  But, my understanding is, yes, he was masked in that social media video.

The government has also reviewed the defendant's social media accounts, and those accounts make clear that the defendant frequently possesses guns, and that he's gang member.  There are many photographs of the defendant holding guns.  There are many posts where he confirms his membership in two

M453ROWC

gangs.

THE COURT:  What gangs?

MR. LIGTENBERG:  The Crips, which I'm sure your Honor is familiar with.

THE COURT:  I am.

MR. LIGTENBERG:  And a neighborhood gang called 3rdSide.  And if I may, I brought just a few examples which I can hand up to the Court.

THE COURT:  As long as you show the defense first, please.

MR. LIGTENBERG:  He has a copy of all of them.

THE COURT:  You may approach.

MR. LIGTENBERG:  So just to go in order.  The first photograph is the defendant holding two guns, appears that the gun in his right hand has an extended magazine, which holds more ammunition so you don't have to reload as much.

Second photograph shows the defendant with what looks like a gun tucked into his pants on his right, our left.

The third photograph is the defendant holding what appears to be a machine gun with a high capacity magazine, a drum, again, so you don't have to reload the gun as much.

The fourth photograph is him holding that same machine gun.

The fifth photograph you get into the gang membership. So just --

THE COURT:  One moment please.

MR. LIGTENBERG:  Yes.

THE COURT:  Thank you.

MR. LIGTENBERG:  So, in this photo, another man has tagged Zaydamunna, which is the nickname for the defendant, and said:  Yeah my brother a Crip and I'm Sex Money.

Sex, Money, Murder is another big street gang as your Honor knows.

But we 3rdSide -- the other gang, the neighborhood gang -- before anything.  Love you kid.

And the defendant reposted this on his social media:  You see his caption bullseye, indicating in effect, yup, that's correct.  We're both from these gangs.  But we're 3rdSide before anything.

THE COURT:  Just so I'm clear, sir.  What you're saying is, the words you see are in fact the caption that Mr. Rowson provided to this particular image.

MR. LIGTENBERG:  Correct.  He reposted someone else's post and indicated his assent, basically.

THE COURT:  On what social media network?

MR. LIGTENBERG:  Instagram.

THE COURT:  Thank you.  Please continue.

MR. LIGTENBERG:  Here is photo number six of the defendant with the caption Crippy, a reference to the Crips, and the color blue, the color associated with the Crips.

M453ROWC

THE COURT:  Although I do note, in fact I found it interesting, because I thought there was red on the first image which I thought was verboten.

MR. LIGTENBERG:  I'm not sure.

THE COURT:  If you just see the sleeves, maybe that's just orange and I'm not perceiving the color correctly.

MR. LIGTENBERG:  I think the 3rdSide, as that prior post indicates, will contain people who are Bloods and Crips. So there is some mixing.

THE COURT:  Thank you.  Please continue.

MR. LIGTENBERG:  The seventh photograph is the defendant with displaying a caption that says:  I put up them shots, among other things, and displaying what appears to be a gang side.

And then the next photograph, the same caption, with the defendant mimicking pulling a trigger at the camera.

THE COURT:  Just let me inquire, sir.  I'm not on social media, because I'm a dinosaur.  But is there a degree to which some of this posting might be attributable more to puffery or wanting to be seen with the latest something and not actually indicative of criminal conduct?

MR. LIGTENBERG:  If the defendant hadn't been arrested twice with loaded firearms, including a stolen firearm, I might agree with that.

THE COURT:  Fair.

M453ROWC

MR. LIGTENBERG:  Given the conduct we know about that he's been caught with, it absolutely raises a reasonable inference that this is not fake, and that this is real, and the guns certainly look real to me.

THE COURT:  All right.  There was discussion yesterday about Mr. Rowson's employment as a porter I believe in a deli and as well as a musician.  Do you have reason to believe he derives funds from any other sources or do you agree that he is in fact employed?

MR. LIGTENBERG:  I have no basis to dispute his employment.

THE COURT:  Thank you.

MR. LIGTENBERG:  So these are just a few examples from his social media.

But, in short, the government believes there is ample evidence that the defendant is a gang member with a history of illegally possessing loaded firearms, including a stolen firearm in this case.  His prior arrest for firearm possession did not deter him from illegally possessing a loaded firearm again.  Just a month ago, while on pretrial release, on another gun charge, the defendant again illegally possessed a loaded stolen firearm.

So given all these factors, the government agrees with pretrial that no combination of conditions short of detention would reasonably assure the safety of the community.

I'll now turn to flight risk.

THE COURT:  Yes.  That's one I have a little bit more trouble with.  Let me please hear from you on that, sir.

MR. LIGTENBERG:  The defendant has demonstrated that he can't stay out of trouble while on pretrial release.  As indicate in the pretrial report, he has the means to flee.  He has successfully evaded law enforcement in the past.

THE COURT:  Are you going to discuss each of those things?

MR. LIGTENBERG:  Yes.  This is like an intro.

THE COURT:  Thank you.  I didn't mean to disturb your flow.

MR. LIGTENBERG:  No, you're good.

I'll focus mostly though on what I think your Honor wants to hear about, which is the events of last Friday, just four days ago when the defendant failed to appear on his state court gun case.

So, to just back up and give the whole story here. The defendant was charged federally in this case on March 21. On March 24, NYPD officers went to the defendant's mom's apartment and to his girlfriend's apartment, they talked to the mom and the girlfriend, both of them said he wasn't there.  And so I think it's safe to assume as of March 24, they passed this information along to him, and the defendant knew there was this warrant out for his arrest.  He did not turn himself in in the

interim. Because the NYPD couldn't find him, the marshals warrant squad was brought in to track him down. And the government obtained warrants allowing --

THE COURT: Just one moment, please. Thank you. I want to let folks get their seats.

MR. LIGTENBERG: Sure.

THE COURT: If you could repeat the last thing you said, sir.

MR. LIGTENBERG: So, because the NYPD couldn't find him, the marshals warrant squad was brought in to track him down. And the government obtained warrants to search the defendant's cell phone and to search his Instagram, the location of his Instagram. The government also learned that the defendant was scheduled to appear in state court for his gun case on last Friday, April 1st, and he was supposed to appear at 9:30 a.m. So, the marshals went to the Bronx courthouse to wait for the defendant to come. They gave a court officer there the heads up that they were there to arrest the defendant. And apparently the court officer passed this information along to the defendant's state court lawyer, who apparently then passed the information along to the defendant.

THE COURT: Please pause there. The court officer passed on the information to the Legal Aid Services attorney?

MR. LIGTENBERG: Correct, your Honor.

THE COURT: Is that appropriate?

M453ROWC

MR. LIGTENBERG:  I don't know.

THE COURT:  Okay, that's fine.  Well, I guess the bigger issue is how do you know that his state court attorney passed on this information to him?

MR. LIGTENBERG:  So, we have talked to, and, frankly since yesterday, we have talked to two ADAs and the marshals to try to get to the bottom of exactly what happened here, and I'll try to run through everything we know.  And if your Honor has a question after I run through that, I would be happy to answer it.

So, apparently, according to the marshals, after the court officer, after they talked to the court officer, defense counsel approached the marshals, and said I hear you're here for my client.  Then she said I am going to call my client.  And then she made phone calls in front of the marshals, presumably to the defendant, and she said on these phone calls you need to come to court.  The marshals heard her say you need to come to court.

We've also talked to the ADA who is responsible for the case, so there are two ADAs, because one is it's his case and the other one was there covering court that day.  Defense counsel that morning texted the ADA responsible for the case and said "What are the feds looking for Rowson for?" And quote, "I heard cops were feds."  The ADA then asked her, "Did he flee?"  And she responded "Did not come."

THE COURT:  I'm sorry.  I did not hear what you just said.

MR. LIGTENBERG:  "Did not come."

THE COURT:  Did he flee?  Did not come.

MR. LIGTENBERG:  Did not come.

I've also talked to an ADA, the ADA that was there in person that was covering court that day.  Defense counsel told that ADA the warrant squad is here to get my client.  At one point she told the ADA that her client was on the way in to court.  Then about an hour later, they talked again, and defense counsel told the ADA that she had been trying and trying and trying to get her client, but that she couldn't get through to him.  And that at some point the calls started going straight to voice mail.  And she told the ADA, I assume this means he got arrested on the warrant.

But, in fact, the defendant had not been arrested.  He skipped court.  He never showed up.  And at this point the marshals were tracking his phone, as I mentioned.  He had that morning, they saw that he had started to come toward the courthouse.  But then, at some point, he either turned his phone off or switched it into airplane mode such it could no longer be tracked.

THE COURT:  There was an explanation that was given yesterday by Mr. Signarello, was there not?

MR. LIGTENBERG:  I believe.  Frankly I'm sort of

confused by the explanation.

THE COURT: I'll let him tell it to me.

MR. LIGTENBERG: My understanding of the explanation, there was some concern about him being able to reach his mother or something.

THE COURT: Who had pneumonia.

MR. LIGTENBERG: So he dropped off the phone. If he were arrested, obviously the phone would be taken. I am not sure what dropping off the phone would accomplish in terms of being able to contact his mother. And it is no excuse for not showing up in court. Even if you drop off the phone at the lawyer's office, you don't have to turn it off. I don't know why you would need to turn it off. You could just leave it at the lawyer's office.

But anyway, the lawyer who was there in person was then able to prevent a bench warrant from being issued. There was not a bench warrant issued. The Court set another appearance for Monday.

THE COURT: When you say "prevent a bench warrant from being issued," that suggests she did something nefarious.

MR. LIGTENBERG: She said my client's not here and let's set it over for Monday I assume. I haven't seen a transcript. But I am not suggesting anything nefarious. The point is she was in court. She was there.

THE COURT: She was in court, so you would have

M453ROWC

thought he would have been in court too.

MR. LIGTENBERG:  Correct.  He was supposed to be in court at 9:30 and he wasn't.  He never showed up.  Based on her communications with the marshals and the ADA, it appears that she thought he was coming, and then at some point he started dodging her.

So later in the day on Friday, the phone either came back on or came out of airplane mode, because the marshals could again see its location.  They saw that the phone was still in New York.  But then the defendant posted --

THE COURT:  One moment please.  I apologize, but I do need to rewind for just a moment.

MR. LIGTENBERG:  Sure.

THE COURT:  Did I understand that there was discussion about dropping off the phone?

MR. LIGTENBERG:  Well, I think defense counsel has represented that he talked to state defense counsel who said he should drop off his phone or something along those lines.  I can't speak to that.

THE COURT:  Of course, and he'll get to speak momentarily.  But, the dropping off was going to be at state counsel's office?

MR. LIGTENBERG:  That's my recollection.

THE COURT:  As distinguished from the DA's office, the courthouse, or some neutral site.

MR. LIGTENBERG:  Correct.

THE COURT:  Is your point it is noteworthy that the phone got turned on later in the afternoon because it suggests it wasn't dropped off?

MR. LIGTENBERG:  I don't think that is a necessary inference.  I think that's a plausible inference.

THE COURT:  Okay, please continue.  Where did the phone go?

MR. LIGTENBERG:  My understanding is that the Instagram was still pinging during this period.  So the Instagram was still up.  That would point towards airplane mode and perhaps a wi-fi connection, and would be inconsistent with a phone sitting in the lawyer's office.

Then later on Friday and into early Saturday morning, the defendant posted two posts to his Instagram in what appears to be an attempt to trick law enforcement into thinking he had left the state.  I've printed those out, shared them with defense counsel, and I'll pass them up with the Court's permission.

THE COURT:  Please.  Thank you.

MR. LIGTENBERG:  So the first post, if you look closely, it is what appears to be the inside of an airplane.

THE COURT:  Oh, I see the middle aisle, yes.

MR. LIGTENBERG:  Correct.  And then a few hours later, he posted this second photograph, which is tagged with the

location Atlanta, Georgia.  And I'll note this isn't like, look at this scenic photograph from Atlanta, Georgia, in my previous trip.  This is to give the impression that you are in Atlanta, Georgia.

But the marshals were tracking his phone, his phone was still in New York.

So, yesterday, April 4, the marshals were able to track his phone to an apartment in Harlem on West 135th Street.  They knocked on the door, apparently the defendant came to the door, but did not open it.

THE COURT:  One moment, please.  The address in Harlem is one of the two, the 150th Street address or there was a Bronx address at 183d Street.

It is none of the above.

MR. LIGTENBERG:  None of the above.  And it is also, I would note, it isn't listed, but the pretrial report indicates that his girlfriend lives in the Bronx.  This address is in Harlem.  So this is an address that is not his mom's address, it is not his grandma's address that he told pretrial is where he currently lives, it is not his girlfriend's address.  It is a totally different address.

THE COURT:  That's where the phone was pinging?

MR. LIGTENBERG:  That's where the phone was pinging and it raises an inference that the defendant was hiding there. It wasn't at any of the three addresses that have been

M453ROWC

identified in the pretrial report.

THE COURT:  Does the apartment belong to someone that I might see from these documents is associated with the defendant?  For example, it is not his mom.  Is it his grandmother, is it a friend?

MR. LIGTENBERG:  I believe it is a relative.

THE COURT:  A relative.  Thank you.  As distinguished from just a random person.

MR. LIGTENBERG:  Correct.

THE COURT:  Thank you, okay.

MR. LIGTENBERG:  So the marshals knocked on the door, the defendant refused to let them in, and they ultimately did have to break down the door.

THE COURT:  They did.

MR. LIGTENBERG:  Yes.  They broke down the door.

THE COURT:  They announced why they were there?  They announced they had a warrant for his arrest?

MR. LIGTENBERG:  Yes, yes.

THE COURT:  He still required them to break down the door.

MR. LIGTENBERG:  Correct, your Honor.

So in sum, the defendant failed to show up for court on Friday, he tried to trick law enforcement into thinking he was in Atlanta, seems like he was hiding in another apartment so they wouldn't find him, refused to open the door when they

came to get him.  He also knew this warrant was active for weeks and failed to surrender.  He has the --

THE COURT:  Pause there.  How did he know it was active for weeks and refuse to surrender?

MR. LIGTENBERG:  Since March 24.  The NYPD talked to his girlfriend and his mother.

THE COURT:  Yes, thank you.  You did mention that. "Weeks" is really two weeks.

MR. LIGTENBERG:  Two weeks.  Two weeks.  Apologies if I misspoke.

THE COURT:  I wanted to make sure I understood it.  It wasn't from March 5.

MR. LIGTENBERG:  Correct, your Honor, correct.

He has the means to flee.  As your Honor knows, he has a demonstrated history of noncompliance while on pretrial release, including in the circumstances of this very case, possessing an illegal stolen loaded firearm while the other case was pending.

So for these reasons, no combination of conditions short of detention would reasonably assure the defendant's return to court.

Happy to answer any other questions.

THE COURT:  If you'll just please give me a moment, thank you.  I'm trying to talk to you and also look at the complaint in this case.

M453ROWC

MR. LIGTENBERG:  Sure.

THE COURT:  At the moment I don't.  I may come back with more questions.

MR. LIGTENBERG:  Thank you.

THE COURT:  Mr. Signarello, I appreciate your patience, sir.  What would you like me to know?

MR. SIGNARELLO:  So, your Honor, I keep hearing the word inference.  The burden is on the government to establish that Mr. Rowson is both a risk of flight and a danger to the community.  In light of that, these inferences should resolve in favor of Mr. Rowson, especially, whereas here, there are reasonable explanations for each of the government's allegations.

Beginning first with what they claim is him being a risk of flight.  Again, I hear a lot of things, the ADA said the court officer told the defense attorney who told me.  I personally spoke with the state defense attorney, who provided me with the explanation --

THE COURT:  Her name?

MR. SIGNARELLO:  Julia Seven is her name.

THE COURT:  Could you spell it?

MR. SIGNARELLO:  S-E-V-E-N.

THE COURT:  Like the number?

MR. SIGNARELLO:  That's correct.

THE COURT:  Thank you.  Go ahead, sir.

MR. SIGNARELLO:  First of all, going back to March 24, where they claim that the state defense attorney and Mr. Rowson first gained knowledge of the fact there was a warrant out for him.

At that time, Ms. Seven tried to contact the NYPD to arrange Mr. Rowson's surrender.  However, she didn't receive a call back so he ultimately wasn't surrendered.  Then, Mr. Rowson was on his way to his scheduled court appearance on Friday.  As you know, his mother, who is here today, she was in the hospital with pneumonia.  He learned from Ms. Seven that it seemed like he was going to be apprehended that day.  He simply wanted to assure he would have a way to contact someone once he was in.  So he --

THE COURT:  I want you to go very slowly on that. This is very, very important to me.

So, you acknowledge that Ms. Seven did in fact advise your client while he was on his way to the state court appearance that he was likely to be apprehended at the state court appearance by other law enforcement authorities.

MR. SIGNARELLO:  Yes.  And he continued to make his way to the courthouse.  She advised him to take his phone and leave it at an office.  That's exactly what he did.  He went there, and he turned off his phone because he wanted to save the battery, and he proceeded to the court appearance.

THE COURT:  Where did he leave the phone, sir?

MR. SIGNARELLO:  It was at -- Ms. Seven had someone who was associated with her, a friend of hers who had a private office she instructed him to leave the phone at.

THE COURT:  Why was Instagram still on?

MR. SIGNARELLO:  He doesn't run -- he is not the only one who runs his Instagram account.  His manager also runs the account.  So, again that's an inference, oh, there was things going on on his Instagram.  That means he must have turned it onto airplane mode and this and that.  There is another reasonable explanation for this, which is his music manager runs his Instagram account.

THE COURT:  Okay.

MR. SIGNARELLO:  Now --

THE COURT:  So the phone was in fact dropped off at Ms. Seven's colleague's office, private office.

MR. SIGNARELLO:  Yes, for a period of time.  And then he was on his way to the court appearance.  But again, Ms. Seven advised him that it was getting late.  My understanding she was on her way, she had vacation.  When I spoke to her yesterday, she had just gotten off a plane.  So it is my understanding that she, instead of waiting for an afternoon call, she got the bench warrant stayed, and he was on his way and advised him to be there for Monday.  Now --

THE COURT:  At that point she then told the folks who were waiting in the courtroom that he wasn't going to appear,

because she had told him not to appear?

MR. SIGNARELLO:  I don't know if she told them that she told him not appear.  He was ordered to arrive there on Monday.  That's what he intended to do.  Over the weekend --

THE COURT:  Sir, excuse me, please, and you'll excuse the many questions I am asking.  I am trying to make sure I understand all of this.  I need bite sized morsels.  She got the bench warrant stayed.  That was for the state appearance, right?

MR. SIGNARELLO:  That's correct.

THE COURT:  But at the time she knew there were federal officers with a federal warrant.

MR. SIGNARELLO:  No.  My understanding is she was not clear whether he was going to be apprehended for federal or for state, and that's reflected by the fact that over the weekend, when, look, it was clear that there was a warrant, that's why we were retained over the weekend.  We didn't know about a federal case, okay.  We were trying to arrange to go to appear in the Bronx state court, so that's the situation regarding that.

THE COURT:  Well, perhaps if the court officer at the state court hadn't blabbed that there were law enforcement officers there, this might not have happened.  I understand.  This was a concatenation of a number of misunderstandings.  That the state court attorney did not appreciate that there

were federal authorities there on a separate matter, that she thought that by staying the bench warrant they would be sated. But why did she think that he ought not come to court if he was on his way to court?  Because she believed that --

MR. SIGNARELLO:  Because --

THE COURT:  Don't interrupt me.

Because they weren't going to make an afternoon call? I am not sure how she got to make the decision that he didn't have to show up.  That's a very strange thing.  I would be sad if you made the decision that your client didn't have to show up for a conference that I convened.

MR. SIGNARELLO:  So, you are in Bronx Supreme Court, it is a calendar call, it appears your client is late.  You ask the judge, your Honor, can I get the bench warrant stayed, can he come here on Monday.  That's what happened, and that was how she advised the --

THE COURT:  If he had left his phone at her colleague's private office, how was she able to contact him to let him know to turn around?

MR. SIGNARELLO:  It's my understanding he was on his way to the colleague's office.  He turned -- and that's when he got the messages from her.

THE COURT:  That's incredibly fortuitous.  But okay, all right.

MR. SIGNARELLO:  Regardless, your Honor.  Look, over

M453ROWC

the weekend we were retained to arrange to have him deal with what appeared to be an outstanding warrant.  And not only that, so now I want to bring us to these allegations he's somehow posting that he's going to Atlanta.

Again, his music manager runs his social media account.  Okay.  Also, those were old pictures from Atlanta.  So to draw the inference that he's posting that he is in Atlanta to deceive law enforcement, it just doesn't resonate to me.

THE COURT:  Well, you're saying it is the manager who posted these photos.

MR. SIGNARELLO:  Yes.

THE COURT:  Why?

MR. SIGNARELLO:  That's information that --

THE COURT:  No.  Why were the photos posted?

MR. SIGNARELLO:  He is cultivating an image.

THE COURT:  Why is he posting images from Atlanta Georgia, sir?  He's not there.  It's hardly an image -- it is a steering wheel of a Honda.  If it was a steering wheel of a Bentley, that's an image to post.  Why is his manager posting an image of a Honda steering wheel in Atlanta, Georgia, of this past weekend or the weekend after the 124th?

MR. SIGNARELLO:  I am noting the music manager -- I can't say why he is posting those.  However, it is my understanding he is cultivating the image of someone who is

traveling.  But that would be an ineffective way of deceiving law enforcement, by posting a picture of him being in Atlanta.  Furthermore, the fact we were retained over the weekend is strong evidence that there was no intent to flee.

Second of all, he did not flee.  He was in New York City the entire time.  And as your Honor noted, he was not at a random third party's house.  He was at his aunt's house who he's close with.  There was no attempt to deceive law enforcement here.

Furthermore, we dispute the allegations that the marshals knocked on the door and announced themselves and then had to knock down the door.  It is my understanding that they simply knocked down the door, which in my experience with law enforcement would not be surprising.

THE COURT:  All right.  Do you want to talk about the other photographs, sir?

MR. SIGNARELLO:  Yes.  So again, first of all, these photos predated the defendant's first case.  They were not taken in New York.  Any of these pictures with what the government claims are firearms were not taken in New York.

THE COURT:  Wait.  You are telling me these aren't firearms?  What are they?

You are not saying one way or the other.  All right.

MR. SIGNARELLO:  But these are from Atlanta, your Honor.  And if they are firearms, they were legally purchased

firearms, so and they were in Atlanta.

Second of all, again, there is pictures of him in blue and now we are saying that's proof he is a gang member.  Second of all, if you look at this, this one --

THE COURT:  I thought, sir, it was the reference on his Instagram feed to Crippy with the blue heart.  Or to his caption -- his retweeting or the Instagram equivalent of a photograph of someone who does designate himself as a Crip.  So, that's where it's coming from.  They are not doing this by clothing color.

MR. SIGNARELLO:  This isn't even his Instagram that he's expressing this caption on.  This is someone else's Instagram.  Same thing with this picture of Crippy.  That's Zayy Rolla.  That's not Mr. Rowson's Instagram.

THE COURT:  Okay.  He has nothing -- he is not the Zay who is mentioned in this Instagram account, sir?

MR. SIGNARELLO:  No, he's Zay Munna.  That's his Instagram handle.

THE COURT:  This is a different Zay entirely, sir.

MR. SIGNARELLO:  Yes.

THE COURT:  Okay.  Please continue.

MR. SIGNARELLO:  So, your Honor, based on the foregoing, second of all, regarding the nature of his -- look, not to minimize in any way the seriousness of the charges, but they are passive, they're passive gun possession charges.  And

yes, there are significant evidentiary issues with the state case. He was in a mask. They are saying they recognize him, it was at night that the officers saw this individual that they claim is Mr. Rowson. So, there's very significant issues with the identification in that case. Here, we have the cops stopping an Uber car because the back seat passenger didn't have a seat belt on.

THE COURT: Not to make myself a witness, sir, but the last time I got into a cab, the cabdriver told me I needed to put my seat belt on because cops were stopping people in his cab for not wearing a seat belt. So that's, I'm not surprised about that. Because that is some initiative that I'm not party to, but I have simply been made aware of.

The bigger issue is, I believe you were saying that one could not see in, and now I have a prosecutor telling me he's seen the body worn camera, he could see in. He saw what the officer saw.

MR. SIGNARELLO: My understanding is that there was a tint to the windows.

THE COURT: Okay.

(Defendant conferring with his counsel)

MR. SIGNARELLO: And it was at night that he was pulled over. Again, your Honor, so, based on that, I do, I submit that there is a significant suppression here. How did we get to the stop from pulling him out the car and searching

him?  I suggest there is probable cause issues in that case.

THE COURT:  Of course.

MR. SIGNARELLO:  I ask if all these inferences are asked to be resolved against Mr. Rowson, he is essentially being asked -- the government is asking you to condemn him before --

THE COURT:  Don't, don't.  I'm not a jury.  Don't be dramatic.  "Condemn."

They are asking me to draw inferences in a certain way.  You are asking me to draw inferences in a different way.  You have provided explanations for each of the inferences they want me to draw.  That's fine.

What else should I know?

MR. SIGNARELLO:  Your Honor, the bail conditions set forth by the magistrate judge are sufficient to ensure that Mr. Rowson will return to court.  Not only has she asked for a $75,000 bond, but she's also issued the condition of electronic monitoring.  Based on that, that is enough to assure that Mr. Rowson will return to court.

So, based on the foregoing, I ask your Honor to issue the same ruling as the magistrate judge, allow Mr. Rowson to put forth three signatories who are financially responsible, and I've spoken to his family, and we have those people.  And to put him on electronic monitoring.  He'll be staying with his mother who is here today.  As is his grandmother, as well as

the mother of his child, and his child who he's actively involved in raising, she's about nine, 10 months right now.

So, your Honor, based on everything before you, I submit that the fair decision is to issue those bail conditions.

THE COURT:  Judge Willis in reviewing the matter expressed a concern that I share, and that is that having, while being on pretrial release for a gun charge, your client managed to catch another gun charge.  So, I appreciate what you're saying and maybe the answer is just that.  He is just an unlucky guy.  These are both very poor charges that will ultimately not succeed.

But I share the concern that she has, that if your client's twice arrested and twice arrested with gun charges, that is something that is troubling.

Tell me, sir, why I should not be troubled by that.

MR. SIGNARELLO:  Your Honor, the conditions of the electronic monitoring will -- he is going to be on house arrest.  That's going to alleviate that concern.

THE COURT:  All right.  Is there anything else you want me to know?  I do have a few more questions for the government, but I don't want to cut you off if there is anything else you'd like me to know.

MR. SIGNARELLO:  No, your Honor.  Not at this time.

THE COURT:  Thank you very much.

And in fact, Mr. Ligtenberg, I want to begin where I just ended. Judge Willis offered some very stringent bail conditions. I'm not saying the bond is especially stringent nor the number of financially responsible parties, but she directed home incarceration, which is the closest thing to jail without being in jail. Why isn't that enough to alleviate the government's concerns about danger to the community or risk of flight?

MR. LIGTENBERG: As your Honor knows, home confinement is only effective if the defendant complies with it. It relies on his cooperation. Our office has certainly seen cases where people flee or cut off their bracelets and leave.

THE COURT: Sure. But playing devil's advocate for a moment -- I want both sides to understand I am asking probing questions because I did not come on the bench with my decision already made. So each of you is getting quizzed by me, and I hope you'll understand that's the purpose of it. It's not designed to beat up on you. It is designed to make sure I understand this.

If the argument is you can cut whatever location monitoring device it is, then that would suggest that one could never have home incarceration, because one could never be sure that this defendant wouldn't at some point cut the monitoring device. So, I think I need a little bit more than that to explain to me why that's not enough.

MR. LIGTENBERG:  As your Honor knows, the counterpoint is if home confinement were always sufficient, then we wouldn't detain anyone and you would put everyone on home confinement. So you have to look at the specific facts of the case, and here the facts as your Honor -- and we noted the most salient fact is that he's already been on pretrial release, albeit on less stringent conditions, and he wouldn't follow the rules.  And as of a few days ago, on Friday, he did not show up for court.

And if I may, I want to address one point there, which I think for me just doesn't add up.  Which is the fact that the story about him being so late for court because he had to drop off his phone.  My understanding is the place he dropped off his phone is supposed to be right by the courthouse.  I don't know why that would delay him more than a few minutes.  So I don't know why that would have made him hours and hours and hours late for court.

THE COURT:  But, sir, you'll understand, I hope, why I wish -- I am having difficulty believing, first of all, that Mr. Signarello would relay inaccurately what he had been told by Ms. Seven, or worse yet, that Ms. Seven would tell him something that was not factually accurate.

MR. LIGTENBERG:  I am not suggesting any particular inference.  Here what's what I know.  I know that the ADA who was there in court told me --

THE COURT:  I see.  So he talked to the defense

M453ROWC

counsel and you talked to the ADA and I get the hearsay from both of you.

MR. LIGTENBERG:  I suppose.  I will note I think it is Susan Seven is the defense counsel.

THE COURT:  Fine.  Go ahead.  So the ADA tells you that they had conversations with Ms. Seven.

MR. LIGTENBERG:  Yes.  Over a period of time while in court on Friday.

THE COURT:  "Period of time" being hours?

MR. LIGTENBERG:  Yes, at least an hour.  I believe what she told me is the first conversation was he's coming to court.  And then the next conversation, approximately an hour later was, I've been trying and trying and trying to call him and I can't get ahold of him.

So, assuming that is true, and assuming what the ADA told me is true, which I assume is true because I don't think she would have any reason to suggest otherwise, either that defense lawyer was lying to her, or what we're hearing isn't true.  Because, if she told him don't bother coming to court, you don't have to come to court, that would have, given the timeline as your Honor noted, that would have had to be before the phone was turned off.  She would have to communicate with that message to him before it was turned off.  When she comes to the ADA and says I've been trying and trying to call him, and it goes straight to voicemail.

The only -- maybe your Honor can think of another explanation.  The only explanations I can think of is, A, she legitimately couldn't get ahold of him and I don't know why we're hearing what we are hearing, or, B, she had in fact -- the story is true, she had in fact told him don't come to court we are going to put it over, don't bother coming to court, and she lied to the ADA.

THE COURT:  Again, I don't want to think about that.  And excuse the judge in me, but who is she to decide that there is not going to be an appearance that day?

What I'm understanding from Mr. Signarello is that she got the bench warrant vacated and she made an arrangement to have the appearance take place on Monday, rather than on Friday.  If that's correct, did she do that in consultation with the ADA?  Did she do that -- either ADA, did she do that in consultation with the judge who was presiding over that part at that time?  I want to understand -- excuse me, I want to understand how she was able to do that.  I would have thought the ADA would have known that that was being done.

MR. LIGTENBERG:  Right.  And I think it's really in the timeline here.  I think my understanding is the ADA sought to have a bench warrant issued.  The judge ultimately did agree to put it over to Monday, but that's later in the day.  Because the marshals were there, my understanding is for hours, the ADA was there after the phone was off.  After the means of

communication to the defendant were cut off, she was still telling the ADA that she was trying to get him to come and she had been trying and trying to reach him and it was going straight to voicemail.

I can't make sense of that with -- she wasn't saying at that point let's get it put over to Monday. When the phone was off, when by her account, the phone was going to straight to voicemail, she was saying I can't get ahold of him. And I don't see how that's, unless that wasn't true, I don't see how that's consistent with her having told the defendant don't bother to show up, we are going to come on Monday. And I don't know why the dropping off of his phone would have made him any more than a couple minutes late for court, rather than hours late for court, such that it started to bump into when this lawyer needed to leave for her vacation or whatever it was that is the reason that she felt she couldn't do in the afternoon. He was supposed to be there at 9:30.

THE COURT: Leaving for vacation. That was on a Friday afternoon?

MR. LIGTENBERG: Yes.

THE COURT: Was it a weekend vacation or was someone to cover on Monday?

Mr. Signarello, yes, did you want to be heard on that issue?

MR. SIGNARELLO: I happen to know she had arranged for

someone else to cover on Monday.

THE COURT:  I see.  Okay.

MR. LIGTENBERG:  I'll also note that I can't say whether the defendant knew it was a federal case.  His lawyer absolutely knew, his state lawyer absolutely knew it was a federal case.  I've seen the text messages between her and the ADA assigned to the case.

THE COURT:  How come Mr. Signarello didn't know when he was retained it was just for a state court case.

MR. LIGTENBERG:  All I am saying is the lawyer absolutely knew because she texted the ADA why are the feds looking for Rowson for and I heard cops were feds.  The fact that defense counsel --

THE COURT:  No.  Please pause right there, sir.

In my discussions with counsel, I've talked about the fact that how, if indeed Ms. Seven got the bench warrant vacated and had the matter put over until Monday, somebody had to tell the marshals not to be there.  And that's the thing I'm finding confusing.

What Mr. Signarello had told me a few moments ago was it was Ms. Seven's understanding that there were only state charges and only state law enforcement folks interested in Mr. Rowson at the time.  You're telling me that that's just not right, because irrespective of what the family said when they retained Mr. Signarello, Ms. Seven knew that federal law

enforcement was there in the state court to apprehend him that day.

MR. LIGTENBERG:  Absolutely.  She texted the ADA.

THE COURT:  In fact, did the court officer say, as best you know, that there were federal law enforcement officers there?  You would say yes, because the message to the ADA was why are the feds here for my client.

MR. LIGTENBERG:  Correct.  And that was where she got the information.

THE COURT:  Thank you.  I appreciate the clarification.

Please continue, sir.

MR. LIGTENBERG:  I'll note the fact that somebody retains a lawyer or has a lawyer does not ensure they are going to fight the charges, that they are not going to flee.  The defendant had a lawyer on Friday.  He didn't go to court.  He had a lawyer a month ago and he still possessed a gun while on pretrial release.

THE COURT:  Yes, but, there is some significance -- and you may dispute how significant it is -- that the family has made a decision to pool their resources and to retain someone, because Mr. Rowson did qualify for appointed counsel. Correct?

MR. LIGTENBERG:  I believe so.

THE COURT:  So I think the argument is, is Mr. Rowson

M453ROWC

going to let down his family that has pooled everything to get him counsel by leaving them on the hook, not merely for counsel, but for a not insubstantial bond?

MR. LIGTENBERG:  I think, be that as it may, still at the end of the day he previously had a lawyer, was fighting charges a month ago, and that didn't stop him from illegally possessing a stolen gun while on pretrial release.  So I think his track record gives a good signal about what he would do if he were released again on this case.

THE COURT:  Thank you.

Mr. Signarello, anything you'd like to say?  Any final thoughts on this, please.

MR. SIGNARELLO:  Just that although Mr. Rowson has these two charges pending, he's never been convicted.  He has no record otherwise.  The bail was set in -- these two preexisting state cases bail had been set by that court at 30,000 and 10,000.  These are much more restrictive bail measures that were set by the magistrate judge, not only with regards to the amount of bond, but also to the very significant addition of the electronic monitoring home arrest.  Based on that, these bail conditions are sufficient to ensure that Mr. Rowson will return to court.

THE COURT:  Thank you.  I am going to need about five or 10 minutes to just think through everything.  I've taken a lot of notes and I want to make sure I've reviewed everything.

M453ROWC

Please excuse me.  I'll be back as soon as I can.

(Recess)

THE COURT:  I mentioned to the parties when I was on my way downstairs, that when I was on my way downstairs I had just finished listening to the proceedings insofar as I could hear them that took place before Judge Willis.  And I heard what was said, I heard the arguments that were made, and I heard her resolution and I understood her resolution.  And Mr. Ligtenberg said to me then that there was additional information that Judge Willis didn't have.

And so, I've taken that very seriously, and that information, plus the arguments I've heard today, give me concern that there is in fact no set of conditions that can ensure the safety of the community or Mr. Rowson's continued appearance in court as directed so I am going to order his detention.

Now, I am concerned about the nature of the offenses.  They're both gun charges, and there are the issues that Mr. Signarello has raised and they will be addressed before the respective presiding judges.  But, a gun charge followed not long thereafter by a gun charge.

The things that I've seen in the photographs, they have some significance to me.  Although, I accept Mr. Signarello's representation that they predate the events at issue here and were taken at a place other than New York.

The gang membership, I think there is evidence suggesting gang membership and that does cause me concern as well.  All of those things suggest a possible danger to the community.

On the risk of flight, that's really what I have been spending most of my time in the robing room thinking about. I've been trying to harmonize Mr. Signarello's statements from Ms. Seven with Mr. Ligtenberg's statements from the ADAs, and the only way I've been able to harmonize them is to conclude that the difference for Ms. Seven when she was going to the initial appearance was the introduction of federal law enforcement officers, that she knew that they were there, that she understood the significance of having them there, that that is why she asked the ADA about why the federal law enforcement authorities were there for her client, and that she did something to communicate to her client not to appear in court. Because what I heard today from both sides, plus the circumstances of Mr. Rowson's eventual apprehension at another relative's house, suggests he was aware, he was aware that federal law enforcement was interested in him, and the circumstances and the timelines presented, particularly by the government, give me concern that he will not appear in court as directed.  And therefore, while I appreciate very much the arguments that have been made, I appreciate the bail package that has been presented, I am not comfortable that this bail

package, even with home incarceration and location monitoring, will be sufficient.

And therefore, I am ordering Mr. Rowson's detention and I am going to do that now.

Mr. Ligtenberg, has there been a preliminary hearing date set in this case?

MR. LIGTENBERG:  Yes, I believe May 4, your Honor.

THE COURT:  May 4, thank you very much. Mr. Ligtenberg, anything else to address in today's proceeding?

MR. LIGTENBERG:  No, thank you.

THE COURT:  Mr. Signarello, anything else to address in today's proceeding?

MR. SIGNARELLO:  No, your Honor.

THE COURT:  Thank you.  All right.  Thank you all very much.  We are adjourned.

(Adjourned)

# EXHIBIT B



# EXHIBIT C



# EXHIBIT D



# EXHIBIT E

